**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-1845

DENNIS CHOQUETTE

Plaintiff,

v.

CORRECTIONS CORPORATION OF AMERICA d/b/a Bent County Correctional Facility;
JORDAN MELGOZA, RN, a/k/a Jordan Mallard;
JAYNE SCARFF, NP;
KATHRYN GRADIN, PA;
GAIL VORIS, RN;
LINDSEY FISH, M.D.;
HOLLY BLUMER, RN;
TIMOTHY CREANY, JR, MD
CARMEN A. MEYER, NP, a/k/a Carmen Cook;
SALLY A. PARKHILL, RN a/k/a Sally Singh;
ROBERTA DAVIES, RN;
ROSANNE DAVIES, RN;
RODNEY ACHEN;
JUANA RODRIGUEZ;
MARK GARDUNIO;
JOSE CONTRERAS;
MARY SHOCKLEY;
ROSA FRAYRE;
RICK RAEMISCH, Executive Director of the Colorado Department of Corrections, sued in his official capacity;
PHYSICIAN HEALTH PARTNERS, LLC d/b/a Correctional Health Partners;
JENNIFER MIX, D.O.;
JANE GILDEN, NP;

Defendants.

---

**CIVIL RIGHTS COMPLAINT WITH REQUEST FOR TRIAL BY JURY AND CERTIFICATE OF REVIEW**

---

Plaintiff Dennis Choquette, by and through his attorneys, HOLLAND, HOLLAND EDWARDS

& GROSSMAN, P.C., complains against Defendants and requests a trial by jury as follows:

## I. INTRODUCTION

1. This is an action brought by Dennis Choquette, a 58-year-old man, to vindicate profoundly serious deprivations of his constitutional and state law rights.

2. Mr. Choquette's known serious medical needs have been treated with deliberate indifference as an inmate of the Department of Corrections.

3. He was, with deliberate indifference, classified such that he was sent to Bent County Correctional Facility (BCCF), a private prison operated by Defendant Corrections Corporation of America on behalf of Defendant Bent County, Colorado, that was known to be unable to handle inmates with his medical needs and ambulation disability related accommodation needs.

4. Despite all involved Defendants knowing that they had diagnosed Mr. Choquette with left-footed Charcot Syndrome, requiring protective devices and offloading, he was intentionally maintained in a facility where he was forced to walk significant distances while simultaneously not being allowed protective and mobility assistive devices such as a wheelchair.

5. Because of the reckless refusal to treat his known serious medical condition, Mr. Choquette's left foot has now been damaged to the point of complete deformity and inability to walk. He is also now largely confined to a wheelchair while being denied medical and surgical procedures needed to get back to some ambulation with knowledge that how he is being cared for medically is completely unreasonable and inadequate.

6. This is a resulting civil action for injunctive, declaratory, and other equitable relief, as well as damages, pursuant to 42 U.S.C. § 1983, for Defendants' violation of Plaintiff's

rights under the Eighth Amendment to the United States Constitution.

## II. JURISDICTION, VENUE, AND NOTICE

7. This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988. The jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

8. This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred.

9. Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

10. The state law claims in this matter are brought against a private corporation and therefore no notice of claims was required as to them under the Colorado Governmental Immunity Act.

## III. PARTIES

11. Plaintiff Dennis Choquette is a citizen of the United States of America, and is and has been at all times referred to herein, a resident of and domiciled in the State of Colorado. Mr. Choquette brings claims related to deliberate indifference at three DOC facilities: Denver Reception and Diagnostic Center, Bent County Correctional Facility, and the Colorado Territorial Correctional Facility. Mr. Choquette is currently incarcerated at CTCF.

Bent County Correctional Facility Related Defendants

12. Defendant Corrections Corporation of America d/b/a Bent County Correctional Facility (CCA) is a Maryland corporation whose principal office is located at 10 Burton Hills Blvd., Nashville, TN, 37215.

13. Defendant CCA's registered agent of service in Colorado is The Corporation Company, located at 1675 Broadway, Suite 1200, Denver, CO, 80202.

14. Defendant CCA is a proper entity to be sued under 42 U.S.C. § 1983 for its own deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff, including individual BCCF Defendants, with respect to the provision of medical care, classification and treatment for inmates with chronic care needs.

15. Defendant CCA is also properly sued for common law negligence, as it is a private corporation, and as such is not entitled to any immunity under the Colorado Governmental Immunity Act.

16. Defendant CCA is sued directly and indirectly for negligence, negligent supervision, negligent and deliberately indifferent policies, habits, customs, practices, usages and training of its staff, for failing to ensure the provision of appropriate classification and care in the treatment of Mr. Choquette, and for the acts and omissions of its agents and/or employees, and for the herein described acts by its involved employees, agents, staff, and affiliates, all while acting within the scope and course of their employment.

17. Defendant Jordan Melgoza, a/k/a, Jordan Mallard, is a Registered Nurse working at times relevant hereto at BCCF. At all times relevant to the subject matter of this litigation, Nurse Melgoza was a citizen of the United States and a resident of Colorado. At all times

relevant to the subject matter of this litigation, Nurse Melgoza was acting under color of state law in his or her capacity as a Registered Nurse at BCCF employed by CCA. This Defendant, with deliberate indifference to Plaintiff's known serious medical needs, intentionally and or recklessly caused Mr. Choquette to be or remain classified in such a way as to permit him to be continuously housed at BCCF with knowledge that this would cause such serious medical needs to be ignored. This defendant was also deliberately indifferent and negligent with respect to the serious medical needs of Mr. Choquette.

18. Defendant Jayne Scarff, NP is a Nurse Practitioner working at times relevant hereto at BCCF. At all times relevant to the subject matter of this litigation, NP Scarff was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, NP Scarff was acting under color of state law in her capacity as a Nurse Practitioner at BCCF employed by CCA. This Defendant, with deliberate indifference to Plaintiff's known serious medical needs, intentionally and or recklessly caused Mr. Choquette to be or remain classified in such a way as to permit him to be continuously housed at BCCF with knowledge that this would cause such serious medical needs to be ignored. This defendant was also deliberately indifferent and negligent with respect to the serious medical needs of Mr. Choquette.

19. Defendant Kathryn Gradin is a Physician Assistant working at times relevant hereto at BCCF. At all times relevant to the subject matter of this litigation, PA Gradin was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, PA Gradin was acting under color of state law in her capacity as a Physician Assistant BCCF employed by CCA. This Defendant, with deliberate indifference to Plaintiff's

known serious medical needs, intentionally and or recklessly caused Mr. Choquette to be or remain classified in such a way as to permit him to be continuously housed at BCCF with knowledge that this would cause such serious medical needs to be ignored. This defendant was also deliberately indifferent and negligent with respect to the serious medical needs of Mr. Choquette.

20. Defendant Gail Voris is a Registered Nurse working at times relevant hereto at BCCF. At all times relevant to the subject matter of this litigation, RN Voris was a citizen of the United States as a resident of Colorado. At all times relevant to the subject matter of this litigation, RN Voris was acting under color of state law in her capacity as a Registered Nurse BCCF employed by CCA. This Defendant, with deliberate indifference to Plaintiff's known serious medical needs, intentionally and or recklessly caused Mr. Choquette to be or remain classified in such a way as to permit him to be continuously housed at BCCF with knowledge that this would cause such serious medical needs to be ignored. This defendant was also deliberately indifferent and negligent with respect to the serious medical needs of Mr. Choquette.

21. Defendant Lindsey Fish is a doctor at times relevant hereto providing telephonic evaluation for inmates at BCCF. At all times relevant to the subject matter of this litigation, Dr. Fish was a citizen of the United States as a resident of Colorado. At all times relevant to the subject matter of this litigation, Dr. Fish was acting under color of state law in her capacity as a Doctor at BCCF employed by CCA or by DOC. This Defendant, with deliberate indifference to Plaintiff's known serious medical needs, intentionally and or recklessly caused Mr. Choquette to be or remain classified in such a way as to permit him to be continuously housed at BCCF with knowledge that this would cause such serious medical needs to be ignored. This Defendant was

also deliberately indifferent and negligent with respect to the serious medical needs of Mr. Choquette.

22. Defendant Holly Blumer is a Registered Nurse working at times relevant hereto at BCCF. At all times relevant to the subject matter of this litigation, Nurse Blumer was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Nurse Blumer was acting under color of state law in her capacity as a Registered Nurse at BCCF employed by CCA. This Defendant, with deliberate indifference to Plaintiff's known serious medical needs, intentionally and or recklessly caused Mr. Choquette to be or remain classified in such a way as to permit him to be continuously housed at BCCF with knowledge that this would cause such serious medical needs to be ignored. This Defendant was also deliberately indifferent and negligent with respect to the serious medical needs of Mr. Choquette.

23. Defendant Dr. Timothy Creany, Jr. is a doctor working at times relevant hereto at BCCF. At all times relevant hereto, Dr. Creany was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Dr. Creany was acting under color of state law in his capacity as a Doctor at BCCF employed by CCA or DOC. This Defendant, with deliberate indifference to Plaintiff's known serious medical needs, intentionally and or recklessly caused Mr. Choquette to be or remain classified in such a way as to permit him to be continuously housed at BCCF with knowledge that this would cause such serious medical needs to be ignored. This Defendant was also deliberately indifferent and negligent with respect to the serious medical needs of Mr. Choquette.

24. Nurse Melgoza, NP Scarff, Nurse Gradin, Nurse Voris, Dr. Fish, Nurse Blumer

and Dr. Creany are referred to as the "BCCF Individual Defendants."

Colorado Department of Corrections Related Defendants

25. Carmen Meyer, NP, also known as Carmen Cook, is a nurse practitioner licensed in Colorado working at Denver Reception and Diagnostic Center ("DRDC") in 2014. At all times relevant to the subject matter of this litigation, NP Meyer was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, NP Meyer was acting under color of state law in her capacity as a Nurse Practitioner at DRDC. This Defendant, with deliberate indifference to Plaintiff's known serious medical needs, intentionally and or recklessly caused Mr. Choquette to be or remain classified in such a way as to permit him to be continuously housed at BCCF with knowledge that this would cause such serious medical needs to be ignored. This Defendant was also deliberately indifferent with respect to the serious medical needs of Mr. Choquette.

26. Sally Parkhill, RN, also known as Sally Singh, is a registered nurse licensed in Colorado, working at DRDC in 2014. At all times relevant to the subject matter of this litigation, Nurse Parkhill was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Nurse Parkhill was acting under color of state law in her capacity as a Registered Nurse at DRDC. This Defendant, with deliberate indifference to Plaintiff's known serious medical needs, intentionally and or recklessly caused Mr. Choquette as a classification delegate or designee to be or remain in such a way as to permit him to be continuously housed at BCCF with knowledge that this would cause such serious medical needs to be ignored. This Defendant was also deliberately indifferent with respect to the serious medical needs of Mr. Choquette.

27. Roberta Davies or Rosanne Davies, RN is a registered nurse working at DRDC in 2014. Undersigned is unable to fully read the signature for this nurse. It appears to say R. Davies, RN. There are two registered nurses in Colorado under R. Davies. Undersigned has consulted with counsel for DOC and requested assistance in obtaining the full name of the proper Nurse Davies which will be clarified. At all times relevant to the subject matter of this litigation, Nurse Davies was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, RN Davies was acting under color of state law in her capacity as a Registered Nurse at DRDC. This Defendant, with deliberate indifference to Plaintiff's known serious medical needs, intentionally and or recklessly caused Mr. Choquette as a classification delegate or designee to be or remain classified in such a way as to permit him to be continuously housed at BCCF with knowledge that this would cause such serious medical needs to be ignored. This Defendant was also deliberately indifferent with respect to the serious medical needs of Mr. Choquette.

28. NP Meyer, Nurse Parkhill and Nurse Davies are collectively referred to as the "DRDC Individual Defendants"

29. Rodney Achen was the Case Manager for Mr. Choquette for DOC in charge of determining the classification for Mr. Choquette which determines his placement. At all times relevant to the subject matter of this litigation, Mr. Achen was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Mr. Achen was acting under color of state law in his capacity as a classification case manager for DOC and is sued for his deliberately indifferent actions in this capacity.

30. Juana Rodriguez is believed to be the Classification Chairperson assigned to

custody designations for Mr. Choquette in 2015. At all times relevant to the subject matter of this litigation, Juana Rodriguez was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Juana Rodriguez was acting under color of state law in her capacity as a Classification worker for DOC and is sued for her deliberately indifferent actions in this capacity.

31. Mark Gardunio is believed to be the Classification Chairperson assigned to custody designations for Mr. Choquette in 2014. At all times relevant to the subject matter of this litigation, Mr. Gardunio was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Mr. Gardunio was acting under color of state law in his capacity as a Classification case manager for DOC and is sued for his deliberately indifferent actions in this capacity.

32. Jose Contreras is believed to be a DOC Classification Supervisor who authorized Mr. Choquette's placement in 2014. At all times relevant to the subject matter of this litigation, Mr. Contreras was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Mr. Contreras was acting under color of state law in his capacity as a case manager for DOC and is sued for his deliberately indifferent actions in this capacity.

33. Mary Shockley, is believed to be a classification specialist assigned to assess Mr. Choquette's classification and placement needs in 2014. At all times relevant to the subject matter of this litigation, Ms. Shockley was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Ms. Shockley was acting under color of state law in her capacity as a classification specialist for DOC and is sued for her

deliberately indifferent actions in this capacity.

34. Rosa Frayre is the Manager of the Assessment & Classification Section for DOC and was the manager assigned to Mr. Choquette's assessment and classification in 2014. At all times relevant to the subject matter of this litigation, Ms. Frayre was a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Ms. Frayre was acting under color of state law in her capacity as a Manager of Assessment and Classification for DOC and is sued for her deliberately indifferent actions in this capacity.

35. Plaintiff believes that the above named classification workers and case manager for DOC are the Administrative Head and Classification Committee members responsible for his classification and placement decisions in 2014 and 2015. Any other names relating to those decisions are exclusively in the possession of the DOC and/or BCCF. Plaintiff seeks to name the individuals responsible for, with deliberate indifference, mis-classifying him and sending him to BCCF causing him injury, if another individual was also responsible for those decisions, they are only not named here by mistake of identity. At all times relevant here to, any such individuals are believed to be residents of Colorado and citizens of the United States of America acting under color of state law in their capacities as Administrative Heads or Classification Committee members. Counsel for Plaintiff has repeatedly conferred with counsel for Defendant CDOC and requested disclosure of any additional classification Administrative heads or Classification Committee members at DRDC, BCCF and CTCF Defendants responsible for such classification but counsel has so far failed to share such information readily available to Defendants and their counsel.

36. Rodney Achen, Juana Rodriguez, Mark Gardunio, Jose Contreras, Mary

Shockley, Rosa Frayre, as classification designees and delegates and any still not known other Administrative Head and Classification Committee Workers are collectively referred to as the "DOC Individual Classification Defendants."

37. Defendant Rick Raemish is the Executive Director of the Colorado Department of Corrections and a state actor for purposes of the Fourteenth Amendment. He is sued officially only. He is statutorily authorized and responsible for the oversight, operation, and administration of Colorado's state correctional system. He has full and active charge of CDOC and its facilities and services, and is CDOC's chief executive and administrative officer. He is responsible for the organization, maintenance, control, and operation of CDOC, the administration, supervision, operation, management, and control of Colorado state prisons, and the custody, study, training, treatment, correction, and rehabilitation of all prisoners in CDOC custody including with respect to their need for medical care and treatment. He is responsible for correcting the constitutional violations described in this Complaint and to the carrying out of injunctive relief sought herein.

CTCF and Correctional Health Partners Related Defendants

38. Defendant Physician Health Partners, LLC d/b/a Correctional Health Partners (CHP) is a Colorado corporation with its principal office and registered agent Kenneth Nielsen located at 1125 17th St., Suite 1000, Denver, CO 80202.

39. Defendant CHP acts as utilization management for DOC, including BCCF, and makes medical decisions for inmates at these facilities as to whether they are allowed access to certain medical procedures. Defendant CHP is a proper entity to be sued under 42 U.S.C. § 1983 for its own deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff with respect to the gatekeeping function of allowing medical care and

treatment for inmates with chronic and acute care needs.

40. Defendant CHP is also properly sued for common law negligence, as it is a private corporation, and as such is not entitled to any immunity under the Colorado Governmental Immunity Act.

41. Defendant CHP is sued directly and indirectly for negligence, negligent supervision, negligent and deliberately indifferent policies, habits, customs, practices, usages and training of its staff, for denying access to the provision of appropriate care in the treatment of Mr. Choquette, and for the acts and omissions of its agents and/or employees, and for the herein described acts by its involved employees, agents, staff, and affiliates, all while acting within the scope and course of their employment.

42. Jennifer Mix, DO, is the Chief Medical Officer for Defendant CHP. Dr. Mix is a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, Dr. Mix was acting under color of state law in her capacity as a Utilization Review Manager for CDOC at CTCF and consciously determined to ignore his DHHA doctor's express recommendation that Plaintiff be provided with surgery or amputation to allow effective treatment of his loss of physical ambulation. This Defendant was also deliberately indifferent with respect to the serious medical needs of Mr. Choquette.

43. Jane Gilden, NP, is a nurse practitioner working for DOC at CTCF. She is a citizen of the United States and a resident of Colorado. At all times relevant to the subject matter of this litigation, NP Gilden was acting under color of state law in her capacity of nurse practitioner for CDOC at CTCF. This defendant was also deliberately indifferent with respect to the serious medical needs of Mr. Choquette.

## IV. STATEMENT OF FACTS

44. As a result of the combined deliberate indifference (and/or negligence of private actors) of medical personnel at Denver Reception and Diagnostic Center (DRDC), Bent County Correctional Facility (BCCF) and Colorado Territorial Correctional Facility (CTCF), and their conscious decision to refuse to treat Mr. Choquette's known and serious medical condition—Charcot foot syndrome—Mr. Choquette's left foot has been destroyed.

45. Mr. Choquette now needs surgery for his left foot, most likely amputation, in order to hopefully regain his ability to walk with prosthetic devices.

46. Plaintiff Dennis Choquette was diagnosed with diabetes in the mid-1990's, long before his incarceration in Colorado Department of Corrections (CDOC) facilities.

47. In 2010 Mr. Choquette was also diagnosed with "Charcot neuropathic osteoarthropathy" in his right foot, also known as "Charcot neuroarthropathy (CN)" or "Charcot foot syndrome."

### Allegations Relating to Charcot Foot Syndrome

48. Charcot foot syndrome most commonly occurs in the United States as a complication of diabetes, often caused by neuropathy, or nerve damage, associated with diabetes.

49. Without medical intervention, Charcot foot syndrome is characterized by fractures and dislocations of bones and joints that can occur with minimal or no known trauma, and frequently involves several bones and joints, with extensive fragmentation and deformity.

50. In its "acute" or "active" stage, Charcot foot syndrome causes significant pain and inhibits a patient's ability to ambulate.

51. In its "chronic" stage, while the pain diminishes significantly, Charcot patients are

vulnerable to aggravation of their condition via excessive and unprotected weight bearing if not properly treated and monitored.

52. The acute symptoms and progression-to-deformity of Charcot foot syndrome can be mitigated and prevented with adequate treatment, including, most importantly, the offloading and immobilization of the affected foot.

53. However, even after resolution of an active episode, it is well understood medically that Charcot patients should at all times only bear weight on affected limbs *with the assistance of protective devices* because these patients have lost protective sensation in the affected limb.

54. Charcot-related loss of protective sensation can lead patients to bear weight excessively, thus exacerbating and multiplying small bone fractures associated with the syndrome, leading to permanent deformity and loss of function of the affected limb.

55. There are a number of effective protective devices which allow Charcot patients to safely ambulate while guarding against aggravation of their condition, including CAM walker/boots, CROW walkers, braces, crutches, canes, walkers, and wheelchairs.

56. In the absence of providing patients including inmates such reasonable and adequate protective devices, every step causes further injury to an affected foot.

57. Charcot food syndrome is a life and limb threatening diagnosis.

**Denver Reception and Diagnostic Center**

58. On or about July 9, 2014 Mr. Choquette became an inmate at the Denver Reception and Diagnostic Center (DRDC).

59. DRDC is the first stop for inmates in DOC. The purpose is to assess the inmate

and evaluate what their medical needs are.

60. DRDC's prisoner handbook states that the:

> Diagnostic/Assessment Process was created to provide an effective way of obtaining important information about you to use in making decisions about special services you may require and/or benefit from while incarcerated with the Colorado Department of Corrections (CDOC). The goal of the next several days will be to find out about any special needs, problems abilities or concerns which need attention. The result of all tests and interviews over the next week or so will be summarized in a Colorado Department of Corrections report which will go with you to any facility to which you are moved. This report will help us respond best to your needs and problems.

61. Upon his entry to DRDC Mr. Choquette's medical history clearly documented his prior diagnoses of diabetes and Charcot foot syndrome in his right leg.

62. As part of DRDC's "Facility Intake" process, jail medical personnel learned that Mr. Choquette was diagnosed with diabetes in 1995 and that he was diagnosed with Charcot foot syndrome in his right foot in 2010.

63. Mr. Choquette informed DRDC medical personnel that he has persistent neuropathy in both legs and numbness in both feet, and thus that he had balance problems, making stairs "treacherous" for him.

64. Mr. Choquette additionally drew the attention of DRDC medical personnel to the edema or swelling of his ankles.

65. Mr. Choquette pointedly expressed to DRDC medical personnel his fear that he might be developing early Charcot foot syndrome in his left ankle and foot.

66. Mr. Choquette was concerned about this because he knew he was going to be in prison and that this was his chance to obtain screening for any serious conditions.

67. On July 9, 2014, Mr. Choquette requested, in writing, from DRDC

accommodations for his "Diabetes," "neuropathy in feet," and "Charcot Foot," stating that he "need[ed] a lower bunk and teir (sic)," that he had "very bad balance, pain and stiffness in hands [and] feet…."

68. Also on July 9 2014, Nurse Parkhill granted Mr. Choquette temporary diabetes related accommodations, including lower bunk and soft-sided shoes. However, she granted no mobility related accommodations.

69. On July 16, 2014, NP Meyer and Nurse Davies, made a plan to obtain X-rays of both of Mr. Choquette's feet for "pain" and because he "states having charcot foot."

70. Also on July 16, 2014, Mr. Choquette was seen by NP Meyer who noted that he had swelling ankles, could not walk more than 100 yards or use stairs.

71. Also on this form, Mr. Choquette reported his history of Charcot syndrome.

72. Despite knowing of this previous diagnosis of Charcot, and his resulting inability to use stairs or walk more than 100 yards, and of the Order for x-rays to evaluate for Charcot foot, NP Meyer and Nurse Parkhill again, with deliberate indifference, affirmatively stated that there were no limitations on Mr. Choquette's mobility noting on disability screening that Mr. Choquette "is not in a wheelchair, is not an amputee, does not use a cane, walker, brace or other assistive health care devices."

73. On July 21, 2014 the ordered foot x-rays took place.

74. When an inmate at DRDC has an x/ray, generally the x/ray is performed onsite at DRDC, and then read by a remote image reading service.

75. Mr. Choquette's foot X-rays were read by Dr. Virginia Scroggins and electronically signed at 14:43 on July 21, 2014.

76. When the remote reading service electronically signs the X-ray report, it is automatically faxed back to DRDC.

77. Dr. Scroggins determined that Mr. Choquette *then* had “bilateral Charcot joints with joint destruction and dislocations in the bilateral mid feet.”

78. Also on July 21, 2014 Nurse Davies and NP Meyer listed these results as follows: “7/21/14 bilateral feet x-ray-findings compatible with bilateral charcot joints with joint destruction and dislocations in the bilateral mid feet.”

79. As of July 22, 2014 Mr. Choquette’s medical record included a diagnosis of “736.70 – UNSPEC DEFORMITY ANKLE&FOOT ACQ – CHARCOT FOOT,” though this diagnosis with deliberate indifference would later be removed from Mr. Choquette’s list of diagnoses.

80. Despite actually knowing as of July 21 or July 22, 2014 of this life and limb threatening diagnosis concerning his left foot, NP Meyer, Nurse Parkhill and Nurse Davies proceeded with their reckless plan to provide no mobility accommodations, no off weighting, and no protective devices for Plaintiff’s left foot.

81. In recklessly not providing the obviously needed mobility restrictions of non-weight bearing and subsequent protective devices, these DRDC medical personnel did not even inform Mr. Choquette of his new very serious known diagnosis of left-footed Charcot syndrome, preventing him even from advocating on his own behalf.

82. With deliberate indifference to his known serious medical needs, it was determined thereafter by DOC staff, including Mary Shockley, Jose Contreras, Mark Gardunio, Rodney Achen, and any other as of yet identified Administrative Head and Classification

Committee members, based at least in part on the recommendations of NP Meyer and Nurse Parkhill, that Mr. Choquette should only be classified as a M4, which is "Moderately Severe" medical needs and means than the "[]o]ffender may have chronic conditions or limitations, including limited ability to lift or walk; scheduled drugs may be required."

83. Mr. Choquette's bilateral Charcot diagnosis in fact made him an M5 in that he had more than just a limit to his ability to walk and he required total offloading.

84. This diagnosis also made him disabled with respect to mobility because he obviously then required continuous off-weighting until his Charcot could be stabilized.

85. Also on July 21, 2014, a Diagnostic Narrative Summary was completed by Mary Shockley where she determined that Mr. Choquette was an M4.

86. Ms. Shockley did not note in her classification document that Mr. Choquette had bilateral Charcot or that he needed to be non-weight bearing and would require a protective device for his foot.

87. Mary Shockley, Jose Contreras, Mark Gardunio, Rodney Achen, and any other as of yet identified Administrative Head and Classification Committee members thereafter determined and decided to classify Mr. Choquette as appropriate to place at a Level III facility, knowing he was not and that this would cause his serious medical needs to go untreated.

88. He was thus placed at BCCF.

89. BCCF is a private jail owned and operated by Defendant CCA and is only authorized to receive inmates whose medical needs are ranked M1-4 and is not authorized to house inmates with serious mobility related disabilities like Plaintiff's.

90. Despite the fact that Mr. Choquette was known to be disabled with respect to

mobility in that he needed to he maintained non-weight bearing, he was assigned to BCCF.

91. Under the contract with CCA to house inmates at BCCF, DOC is required to maintain a certain population at BCCF. This term provides a contractual and financial incentive to send inmates to BCCF, even when BCCF cannot handle their placement and meet their known serious medical needs and disabilities.

92. Mr. Choquette was moved a few times while waiting for a totally unsuitable for him BCCF bed to open up.

93. Despite actively knowing about Mr. Choquette's life and limb threatening diagnosis of Charcot then recently found in his left foot as well, the individual DRDC Defendants with deliberate indifference to his serious medical needs fraudulently concealed from and did not communicate this diagnosis to Mr. Choquette, or to the intervening facilities to which he was taken from DRDC including ultimately to BCCF, causing preventable severe and continued damage to his left foot to the point of destruction.

94. Plaintiff did not learn what these DRDC Defendants had fraudulently concealed from and done to him despite their conscious awareness of his X/rays by July 21 or July 22, 2014 until at least mid January, 2015.

95. On or about July 28, 2014, Mr. Choquette was transferred to Colorado State Penitentiary and on August 7, 2014 to La Vista Correctional Facility.

96. Because of deliberate indifference in also fraudulently concealing and failing to communicate by DRDC Defendants, no treatment or accommodations were made for Mr. Choquette's known Charcot diagnoses at either of these temporary facilities

97. On or about August 13, 2014, Mr. Choquette was transferred to BCCF.

98. From July 21, 2014 until Mr. Choquette was admitted to BCCF, because of DRDC related Defendants conscious deliberate indifference, Plaintiff was required and actively encouraged to continue to walk on his Charcot afflicted foot without a protective device.

99. He was not off-loaded at all, he was not provided a wheelchair and he was not provided protective devices.

100. Every step he took caused further significant damage to the bones of his feet.

101. This reckless deliberate indifference continued with increasing recklessness at BCCF.

102. Defendant CCA has a widespread practice, custom, habit and policy of tolerating and encouraging deliberate indifference to known serious medical needs in the form of refusals of higher level care, refusing to transfer inmates to the hospital even when they are complaining of serious and life or limb threatening medical needs, of treating inmates like they are faking their illnesses and of seeking to delay any necessary expensive care until an inmate can be paroled without otherwise providing him with adequate medical care.

103. Whenever Mr. Choquette presented his complaints to individual Defendant and other BCCF staff and told them he was scared he was causing permanent damage to his foot, the first question he would be asked was when he would be parole eligible.

104. These nurses are obviously trained and required by policy, training, habit and custom to consider first whether they can just wait the inmates needs out until he is released to avoid the costs of providing adequate and obviously seriously needed care.

105. The widespread nature of this deliberate indifference between September of 2014 and March of 2015 shows the extensive impact of the toleration of and encouraging of ignoring

serious medical needs, treating them as faked or non-serious, and denying inmates access to emergency and higher level services and instead providing inadequate medical care.

106. Defendant CCA trains employees to disregard subjective complaints of inmates, treating them as faked or exaggerated or seeking to delay treatment as long as possible so as to avoid paying for it, even when such conduct is known, as here, to be likely to cause serious injury.

107. Defendant CCA owns and operates many private jails around the country and has been sued hundreds of times for similar patterns of reckless deliberate indifference, including but not limited to the cases described in the following paragraphs.

108. A 2001 jury verdict related to an inmate whose jaw was left wired shut for 10 weeks, the jury wrote that they hoped the message sent by the verdict would ‘echo throughout the halls of your corporate offices as well as your corporate housing facilities.”

109. In 2004 a mother filed a lawsuit against CCA for her son’s death at the CCA-run Kit Carson Correctional Center in Colorado. The deceased inmate suffered from a hereditary condition that caused his breathing passages to swell, a condition that had been easily and effectively controlled with the prescription medication Winstrol. The Plaintiff mother alleged that CCA refused to pay for a 30-day supply of Winstrol on the grounds that her son was to be released within ten days, and the facility did not wish to incur the extra cost. Thus CCA medical personnel did not give the inmate his medically necessary Winstrol medication, causing his death from an easily treatable condition.

110. CCA prisons have been sued at least five times since 2004 for denying needed medical care to pregnant women causing injury to the women and the death of their babies. In

one of these cases, an inmate who complained of bleeding was returned to her cell so her bleeding could be monitored to prove she wasn't making up her complaints.

111. A 2007 lawsuit by the ACLU against CCA's San Diego immigrant detention centers prompted the Department of Immigration Health Services to take over provision of medical care at these facilities.

112. The lawsuit alleged that CCA squeezed profit from its immigrant detention contracts by scrimping on the already minimal services it was required to provide, including attempting to increase its profits by decreasing medical services provided to detainees.

113. In 2013 the Texas state legislature shut down CCA-run Dawson State Jail after several inmates died of treatable medical conditions. One of the deceased prisoners was Pam Weatherby, who died at CCA's Dawson State Jail in May 2010 after not being provided with the state-mandated special diet for diabetic prisoners, and after being taken off her insulin shots, contrary to her well-documented treatment plan.

114. More recently, a Mother Jones magazine article by a reporter who worked for CCA for four months as a private prison guard recounts the story of an inmate named Robert Scott who lost both legs and several fingers to gangrene despite complaining over and over to medical staff at a CCA prison in Tennessee. Mr. Scott's pending lawsuit alleges that he complained many times, like Mr. Choquette, and that he was offered cheap and irrelevant treatments like corn removal strips (or in the case of Mr. Choquette, Ted Hose), and told that if he didn't stop complaining he would get a write up for malingering.

115. Mr. Scott alleges that CCA ran the jail on a 'skeleton crew' for profitable gain, as again happened here.

116. CCA's widespread pattern and custom of providing deliberately indifferent medical care to inmates in its custody has also had dire consequences at BCCF—the very same facility which has destroyed Mr. Choquette's foot.

117. In 2010 inmate Terrell Griswold died at BCCF of a treatable condition. His parents sued the doctor and the facility, alleging that their son's doctor made orders without seeing him and that the orders weren't followed.

118. Mr. Griswold's continuous complaints and months-long series of requests for medical care were ignored. CCA medical staff refused to provide Mr. Griswold with even the bare minimum evaluation and treatment for his developing urinary tract symptoms.

119. CCA medical staff also refused to send Mr. Griswold outside the facility for necessary higher-level care. Mr. Griswold eventually died from easily treatable urinary blockage.

120. Wyatt Handy recently sued CCA and CHP for injuries caused to him while he was incarcerated at Kit Carson Correctional Center, a CCA-operated jail, in 2013-2014. He was diagnosed with stage 4 keratoconus, a progressive eye disease, which in such an advanced state causes severe headaches, blurriness, and loss of vision. Denver Health physicians told Mr. Handy that the only treatment for his very advanced condition was a special type of contact lens—a scleral lens—or surgery. After not receiving the physician-recommended treatment for many months, Mr. Handy submitted a kite asking for either a scleral lens or surgery to correct his keratoconus. Dr. Tiona denied his request, in doing so stating that CDOC would not pay for the scleral lens, and that Mr. Handy would have to pay for them himself. Mr. Handy was repeatedly told that CDOC's insurance provider, CHP, would not pay for scleral lenses. Instead, CDOC and CHP authorized Mr. Handy to have eyeglasses and regular contact lenses a cheap but completely

unresponsive and ineffective treatment for his late-stage keratoconus.

121. Mr. Choquette was abused by these same patterns, practices and policies of refusing known badly needed medical care to save money even when there is no alternative to prevent permanent damage, loss of function, and suffering.

**Bent County Correctional Facility**

122. On August 26, 2014 a "reviewing provider" for BCCF with deliberate indifference to Plaintiff's serious medical needs signed and approved by the initials "TC" that Mr. Choquette's M-code classification and problem list had been checked out and was appropriate.

123. TC is believed to be Tim Creany, MD, a doctor believed to be employed by CCA or DOC and who worked at BCCF as a doctor in 2014 and 2015 and made such classification determinations.

124. BCCF houses inmates for the Colorado Department of Corrections (CDOC) CDOC pursuant to an intergovernmental agreement between CDOC Bent County, and Defendant CCA whereby CDOC inmates are housed at BCCF in exchange for a per-inmate-per-day fee.

125. Pursuant to this contractual relationship, CCA operates BCCF and provides medical care to CDOC inmates housed therein.

126. On information and belief, CDOC guarantees minimum occupancy at BCCF to incentivize CCA to maintain this relationship.

127. Of particular relevance to Mr. Choquette's known left-leg Charcot foot syndrome, BCCF is not capable, and was well known not to be capable, of housing inmates who need a wheelchair or have mobility related disabilities.

128. While DRDC Defendants with deliberate indifference did not place the Charcot diagnosis in Mr. Choquette's file for this facility, BCCF staff became consciously aware of the recent bi-lateral Charcot diagnosis on September 3, 2014.

129. From October, 2014 until March 2015, Mr. Choquette routinely requested help from the BCCF Individual Defendants, telling them he could not walk as far as they were requiring him to walk, that he was worried about his Charcot syndrome potential in his left foot, that he needed protective devices and that he was in significant pain but they all deliberately indifferently and negligently refused to intervene.

130. BCCF Individual Defendants thus from September 3, 2014 forward until he left their jail, as part of a deliberately indifferent classification decision driven continuing course of medical care, consciously refused to facilitate the known to be needed and critical offloading and immobilization of Mr. Choquette's left foot and ankle necessary to avoid dramatically aggravating his Charcot foot syndrome.

131. Despite the conscious awareness of Mr. Choquette's desperate need for the same in this same time frame, the involved BCCF Individual Defendants, again as part of a deliberately indifferent classification decision driven continuing course of medical care, recklessly and consciously refused to provide him with protective devices, canes, crutches, a wheelchair or any orders at all related to his life and limb threatening known diagnosis.

132. Instead, BCCF Individual Defendants as part of this continuing course of classification driven care derelictly constantly forced Mr. Choquette to aggravate and greatly worsen his left-leg Charcot foot syndrome by attempting to walk around BCCF, unprotected, on a daily basis.

133. Mr. Choquette routinely raised that Charcot could be causing the swelling, but was ignored.

134. At some point Mr. Choquette viewed copies of his records and learned that the x-rays had in fact diagnosed him with left footed Charcot. From that point on at every medical encounter he told BCCF Individual Defendants that the edema related treatments were unrelated to his needed Charcot treatments and that he was concerned they were causing permanent damage. This derelict course of continuing care continued until it was too late.

135. Thus, as this course continued in both private and public jails, Mr. Choquette's Charcot-related swelling, numbness, pain, difficulty ambulating, and foot deformity, continued to get needlessly worse.

136. Upon Mr. Choquette's transfer to BCCF, CCA's Jordan Mallard (Melgoza), RN conducted an August 13, 2014 "Initial Intake Screening," at which Mr. Choquette informed RN Mallard (Melgoza) that he had a history of "Diabetes," "Charcot," and "neuropathy."

137. On August 26, 2014, a worker for BCCF, believed to be Tim Creany, MD certified that Mr. Choquette, despite actual knowledge of his then new diagnosis of bilateral Charcot, was appropriately medically and otherwise classified for BCCF.

138. Dr. Creany repeatedly signed off on medical records and the classification for Mr. Choquette during his stay at BCCF and actually knew of the serious diagnosis of Charcot in his left foot and the attendant need for off loading and protective devices, yet, on behalf of BCCF, with deliberate indifference and negligence maintained the position that Mr. Choquette was medically classified appropriately for BCCF.

139. When Mr. Choquette specifically requested that his lower-tier/lower-bunk

accommodations be honored, CCA medical personnel responded by stating: "We don't care. We do our own evaluations."

140. Thus CCA medical personnel assigned Mr. Choquette to an upper bunk on an upper tier, which required Mr. Choquette to bear weight and ambulate, excessively and without protection, every day.

141. Upper bunk and upper tier are apparently harder beds to fill because of medical restrictions common among the population and BCCF had a profit motive for refusing to accept DRDC's finding that Mr. Choquette required lower bunk, lower tier placement to keep more beds full.

142. On September 3, 2014, Mr. Choquette was seen by PA Kathryn Gradin. Mr. Choquette requested bottom bunk, bottom tier restrictions. He told PA Gradin that he has "severe neuropathy" in his lower extremities that cause "decreased strength and impaired balance," that he was "off balance" and a "fall risk." He also told her that he "has Charcot foot and had recent x/ray of feet that should be back by now."

143. Despite the knowledge that Mr. Choquette had a new diagnosis of Charcot in his left foot, which made him inappropriate to be classified for placement and maintenance at BCCF, BCCF's administrative head and classification committee members maintained Mr. Choquette at BCCF until medical emergencies caused him to finally receive a "no privates" order in March of 2015.

144. Also on September 3, 2014, PA Gradin noted in the objective portion of this health record that Mr. Choquette had bi-lateral Charcot foot, verified by x/ray and finally granted lower bunk lower tier.

145. PA Kathryn Gradin noted that Mr. Choquette had "2+ pretibial edema appreciated," "decreased sn," and "+Charcot foot, B/L—these findinds (sic) verified by xray."

146. PA Gradin, despite now actually knowing of this limb and potentially life threatening diagnosis, nonetheless did not provide Mr. Choquette with non-weight bearing orders or evaluation for protective devices or seek his reclassification and discharge from this jail where she knew he could not be housed under classification rules.

147. She did not even tell Mr. Choquette that his recent DRDC x/rays were back and had diagnosed him with Charcot in his left foot now as well.

148. While Mr. Choquette now had lower bed, lower tier restrictions he was still placed in a cell far from dining and other services and had to walk extensive distances on his affected feet without protective devices, cause grave injuries.

149. BCCF staff maintained Mr. Choquette in the "General Population," rather than "Medical Observation" or some other designation, which would have required BCCF personnel to more closely monitor Mr. Choquette's known and serious medical condition even after learning of this life and limb threatening diagnosis.

150. Over the course of the next 7+ months, Defendant CCA medical personnel, including each BCCF Individual Defendant, in a unconscionable display of deliberate indifference to Mr. Choquette's known and serious medical condition, ignored Mr. Choquette's left-leg Charcot foot syndrome and known need for off weighting and protective devises and re-classification.

151. Despite actively knowing of this serious diagnosis, CCA medical personnel, including the BCCF Individual Defendants, with reckless deliberate indifference and/or

conscious awareness told Mr. Choquette that he just had edema and ordered no appropriate treatment.

152. Thus Defendant CCA medical personnel including the Individual Defendants named herein—in daily acts of deliberate indifference and negligence—continued to cause Mr. Choquette to bear weight on his left foot on a daily basis, excessively and without protection.

153. On October 3, 2014, despite actual knowledge a month earlier of the new left foot diagnosis of Charcot foot, Dr. Creany again signed off on Mr. Choquette's continuing classification placement at BCCF, a facility he knew could not handle his medical or accessibility needs.

154. Yet again on October 29, 2014, Mr. Choquette went to the BCCF prison clinic "with complaints of increased swelling in his feet."

155. Dr. Creany and Nurse Gail Voris saw Mr. Choquette, who "want[ed] to be sure medical knew the swelling was worsening."

156. However, neither did anything to protect Mr. Choquette from excessive and unprotected daily weight bearing on his worsening Charcot-affected left foot or to cause his re-classification.

157. On November 24, 2014, for the fourth time since he was transferred to BCCF, Mr. Choquette again informed CCA medical personnel, including Lindsey Fish of his worsening Charcot-related symptoms in his left foot.

158. According to notes from Mr. Choquette's November 24, 2014 visit to the BCCF infirmary, he reported "edema in lower legs, increasing in the last 90 days," "+ neuropathy," "charcot in right foot for sure and maybe left foot."

159. CCA's Dr. Lindsey Fish noted that Mr. Choquette had "2+ pitting edema to knee bilaterally, no sensation…" and that "X/rays of [his] feet from DRDC show bilateral Charcot foot."

160. Rather than treat Mr. Choquette's worsening left-leg Charcot, Dr. Fish recklessly and with deliberate indifference decided to maintain his impermissible classification to be at BCCF without needed medical devises and merely ordered "TED hose for edema."

161. "TED hose," or "Thrombo Embolic Deterrent Hose," is a type of compression garment designed to prevent non-ambulatory patients from developing blood clots in their legs, which could develop into life-threatening pulmonary emboli.

162. To this Doctor's awareness, TED hose are not a treatment for Charcot foot syndrome because the stockings do nothing to offload or immobilize the Charcot-affected ankle or foot.

163. Thus, with deliberate indifference misclassified by this Defendant doctor, and the other named BCCF Defendants, Mr. Choquette continued to bear weight on his Charcot-affected left leg, without protection and on a daily basis.

164. Mr. Choquette became so concerned about how difficult his ambulation was becoming and how significant the swelling was becoming, that he requested his medical records where he learned for the first time that he had been diagnosed with left-foot Charcot which had been fraudulently concealed from him.

165. He was so concerned by this, and the extent of his swelling that on January 11, 2015 he was forced to self-declare an emergency to get CCA medical personnel to revisit his worsening Charcot-affected left foot.

166. He reported that he has worsening problems with his legs since November 24, 2014 which included cramping, swelling, difficulty bearing weight, numbness, and tingling and that it was worse on his left side. His legs were very swollen, worse on the left, and both had pitting edema. The swelling on his left went all the way to his kneecap.

167. CCA's Nurse Jordan Melgoza noted that Mr. Choquette "ambulated to exam room w/ difficulty, limping and grimacing."

168. Nurse Melgoza further noted that Mr. Choquette had significant swelling in both feet, so bad, in fact, that Mr. Choquette's pulse was hard to find.

169. While Nurse Melgoza gave Mr. Choquette the TED Hose ordered by Dr. Fish several weeks previously, neither Nurse Melgoza, Dr. Fish, nor any other of Defendant CCA's medical staff treated Mr. Choquette's known and obviously very serious and continuing to deteriorate medical condition by ordering him to offload or immobilize his Charcot-affected left leg.

170. Given that, to their knowledge, neither "TED Hose" nor "compression stockings" help a Charcot patient to offload or immobilize the affected foot and ankle, and are thus not a recognized treatment for Charcot foot syndrome, the stockings did nothing to treat or mitigate Mr. Choquette's Charcot foot syndrome.

171. Mr. Choquette was seen by NP Scarff on January 13, 2015 for "swelling of his lower legs since 11/14."

172. Mr. Choquette again told NP Scarff that he had declared an emergency and that he could not walk and thought it was because of Charcot. NP Scarff noted the "recent dx of charcot in both feet" and again recklessly failed to issue protective orders related to the Charcot

diagnosis.

173. On January 22, 2015, Mr. Choquette's classification status came up for a period review. Juana Rodriquez and/or the Administrative Head or classification committee members with deliberate indifference determined to maintain Mr. Choquette at Bent County despite his increasingly terrible medical crisis.

174. On information and belief, Ms. Rodriquez arrived at this continued deliberately indifferent classification of Mr. Choquette as appropriate for BCCF in conjunction with classification workers at BCCF.

175. Defendant CCA medical personnel knowingly implementing this deliberately indifferent classification, knowing full well to them to be resulting in the continuing deliberately indifference maintenance of Plaintiff as an inmate in this jail for CCA's profit, then doubled down on their deliberately indifferent response to Mr. Choquette's Charcot-affected left foot: on January 28, 2015, without seeing Mr. Choquette, Dr. Fish prescribed Mr. Choquette a second pair of compression stockings.

176. NP Scarff saw Mr. Choquette again on February 2, 2015 where she again noted "57 y/o male here for f/u leg swelling and sob." Despite the continued swelling and known diagnosis of Charcot, NP Scarff again recklessly did nothing.

177. Mr. Choquette received the second pair of compression stockings on February 12, 2015.

178. In March, 2015, Mr. Choquette's deteriorating condition worsened. His swelling was extreme and every time he tried to bear weight on his left foot it would bend at the ankle at almost a 90-degree angle.

179. From March, 2015 forward every step caused crunching and bones shifting in his foot.

180. Mr. Choquette became so concerned about his medical condition that he told every medical worker he came in contact with that he was scared about serious damage to his left foot.

181. It was made clear to him that they thought he was exaggerating his condition and being a hypochondriac.

182. On March 11, 2015, NP Scarff again saw Mr. Choquette when Nurse Voris asked her to give orders. At this point, Mr. Choquette again came to medical to report the severe swelling in his ankles.

183. Mr. Choquette informed them that the TED hose and diuretics were not working and were ridiculously unrelated to his Charcot.

184. Responding to Mr. Choquette's March 11 complaints about his Charcot-related symptoms, CCA's Nurse Voris and NP Scarff instructed Mr. Choquette to "wear [his] compression stockings and to elevate [his] feet," and ordered the continuation of his diuretic medication.

185. On many occasions, Mr. Choquette told Nurse Blumer that he could not walk, that he needed help and he was worried about his Charcot, but she over and over told him he had to walk, refused to intervene and refused to obtain orders or transfer him to a hospital.

186. In the morning on March 14, 2015, Nurse Blumer charted that Mr. Choquette was having chest pains and the on call provider ordered him to the hospital.

187. Nurse Blumer charted that "IM also brought to attention that his feet are "super

swollen and appear shiny."

188. Nurse Blumer simultaneously with deliberate indifference filled out a document showing no problems and unremarkable exam of Mr. Choquette's legs.

189. Mr. Choquette was taken to the emergency room at Arkansas Valley Regional Medical Center where he was cleared for heart attack and brought back to BCCF.

190. Mr. Choquette was sent back to the BCCF infirmary by security personnel for readmission to BCCF. He was complaining of severe, "9.9/10" pain below his knees.

191. It took Mr. Choquette 20-25 minutes to walk to medical, a trip of normally five minutes, because he was so disabled that he had to cling to the wall. His feet were so swollen that he could not get socks or shoes on.

192. CCA's Nurse Melgoza noted in a 14:48 chart entry: "L leg 2+ pitting edema up to knee cap, 3+ by ankle. L calf measures 49.5 cm. Pulse not palpable…."

193. In response to his objectively worsening left-leg Charcot foot syndrome, CCA's Nurse Melgoza and the rest of the involved care team with continuing dereliction, implementing this deliberately indifferent administrative classification and deliberately indifferent medical care, outrageously "educated [Mr. Choquette] to wear his tedhose as instructed and elevate his feet."

194. She noted that he was "able to ambulate out of medical" despite being consciously aware that he was telling her he could not walk.

195. He asked for a wheelchair or some type of brace or any help but was told no.

196. Officers and other inmates in the area asked why he was allowed to leave medical when he so clearly could not walk.

197. Mr. Choquette was brought back to medical shortly thereafter. Security got him a wheelchair to take him there.

198. Nurse Cardinelli reported that he "continues to complain of lower extremity pain and is unable to walk due to the pain."

199. CCA Nurse Cindy Cardinelli recorded her assessment of Mr. Choquette as follows: "Offender has 3-4 plus edema to BLE, he is unable to apply pressure to his feet without pain, pedal pulses obtained with a Doppler the left foot is colder than the right. No report of tenderness with palpation to the lower extremities due to neuropathy. Measurements to the LLE is calf 19 ½ inches, ankle is 12 ½ inches…both feet are red and shiny….".

200. Nurse Cardinelli recorded that by this time he had "sharp," "aching," radiating, "stabbing" pain and that his foot was swollen, warm/hot, red, and discolored.

201. Mr. Choquette was then sent to the emergency room at Arkansas Valley Regional Medical Center (AVRMC) for evaluation and treatment of his now-crisis-stage Charcot foot syndrome.

202. As reported by AVRMC's Janice Marie Weixelman, DO, Mr. Choquette explained that "he has been unable to walk to the dining hall without assistance for the past 2 weeks and this is getting even worse. He is not allowed a wheelchair or crutches in the facility where he is currently incarcerated and he is in a cell that is in the most remote area to the dining facility. Officers and pt state that if he needs a wheelchair, he will need to be transferred to the territorial correctional facility where there is a building section that allows for a higher level of infirm to include a wheelchair."

203. DO Weixelman's primary impression of Mr. Choquette's condition was

"Charcot's joint of foot."

204. After being stabilized Mr. Choquette was then transferred to Colorado Territorial Correctional Facility (CTCF) on March 15, 2015 where this deliberately indifferent course of care by DOC and its contractors continues to this very moment, visiting additional harm to Plaintiff.

205. Upon transfer to CTCF, the severity of Mr. Choquette's left-leg Charcot foot syndrome was variously described on March 15 and March 16 as: "BL LE 3+ pitting edema that has worsened throughout the day. L LE pitting and swelling are worse than R. L LE is red up to knee and skin is shiny over foot…."; "Left lower extremity with 4++ edema. Skin to foot tight/shiny. Redness noted to calf area…Increased temp noted to area."; "[r]adial pulses difficult to palpate…."

206. CTCF Nurse Rebecca Wright noted Mr. Choquette's "large," "edematous" left foot, and that it had become untenable for him to try and walk: "[Mr. Choquette] limp[s] on lateral side of foot when ambulating. Ambulation painful, unsteady."

207. Mr. Choquette was significantly off-loaded in the infirmary in that he did not have to walk very far and was given some assistive devices, but CTCF staff also continued to force him to weight bear. He is repeatedly noted in the records to be "angry" about being denied a wheelchair.

208. Despite that Mr. Choquette was obviously in an acute Charcot crisis, CTCF staff Nurse Practitioner Rife and Nurse Cella recklessly dismissed the seriousness of his condition noting "Pt readily tells me his diagnosis of Charcot's in bilat feet, then acts as if he doesn't know what it is or that it is chronic. Went to American Orthopedic Foot and Ankle Society to get

patient info which I gave to the pt."

209. CTCF staff recklessly and outrageously continued to encourage him to walk, saying it was good for him, when in fact it was known to be very dangerous for him and to be constantly aggravating his already terrible condition.

210. CTCF medical personnel then ordered a cane for Mr. Choquette, in doing so noting: "will place order for cane for balance and gait assistance, this will likely need to be permenant (sic) as his condition will be progressive."

211. While Mr. Choquette's edema improved to some degree over the ensuing days at CTCF, his blood tests indicated a rapidly spiking white blood cell count, indicating serious infection.

212. Additionally, because of CTCF medical personnel's overly aggressive use of three different diuretic medications—on the pretense that these would solve Mr. Choquette's purported solely-edema-related medical problems, Mr. Choquette's kidneys shut down.

213. Dr. Wright at CTCF recklessly and deliberately indifferently discharged Mr. Choquette back to BCCF, with a raging infection, without critically needed off loading instructions, and in significant renal distress from overuse of diuretics.

214. Thus, Mr. Choquette was again transferred back to BCCF sometime during the morning or early afternoon of March 25.

215. Mr. Choquette's transfer to BCCF, and his bed-filling acceptance there, was knowingly against CDOC policy, which states that inmates with serious and chronic medical conditions and mobility disabilities such as Mr. Choquette's are not to be housed at BCCF.

216. Upon seeing Mr. Choquette back at BCCF, one of the CCA's physician's

assistants took one look at him and said: “Choquette, you look like you’re about to drop dead!,” and then facilitated Mr. Choquette’s immediate return to AVRMC for another round of emergency care for this medical crisis.

217. When Mr. Choquette went back to AVRMC on March 25, for his second Charcot-related emergent visit in eleven days, he also had an open wound on his left ankle and a raging MRSA infection.

218. Additionally, the combined deliberate indifference of CCA’s and CTCF’s medical personnel—who recklessly insisted that Mr. Choquette’s troubles stemmed solely from “edema” despite clear diagnostic evidence to the contrary—caused Mr. Choquette to suffer acute renal from overuse of diuretics.

219. AVRMC caregivers’ initial comments noted that Mr. Choquette “was found to have a very high wbc without explanation…the staff reports he did not have a septic workup. The concern at present is that he has sepsis that has not been adequately evaluated and certainly not adequately treated.”

220. Mr. Choquette had an open wound on his left foot, which proved to be the source of a systemic MRSA infection, which had caused Mr. Choquette’s white blood cell count to increase dramatically while at CTCF.

221. Noting Mr. Choquette’s “long standing” “Charcot joint, right and left ankle,” AVRMC caregivers also took x-rays of Mr. Choquette’s feet on March 25, which confirmed the now great severity of his left-foot Charcot diagnosis and “demonstrated marked deformity of the tarsal region of the left foot consistent with Charcot joint. Bone resorption and fractures are present….”

222. A CT-scan conducted on March 27 at AVRMC further confirmed the fact this deliberately indifferent continuing course of medical care had destroyed Mr. Choquette's left foot: "Extensive changes of Charcot joint arthropathy of the mid and hind foot with associated soft tissue swelling and induration without abscess formation confirmed."

223. However, despite understanding that Mr. Choquette's Charcot-affected left foot had literally been destroyed by his time at BCCF, CDOC officials again callously attempted to transfer back again to BCCF, a facility not equipped to handle an inmate with severe Charcot foot syndrome, and the very facility that had thus far ably demonstrated its deliberate indifference to Mr. Choquette's known and serious medical condition.

224. To prevent Mr. Choquette's transfer back to BCCF, AVRMC caregivers personally intervened with "phone calls" and "literature" to convince CDOC that Mr. Choquette could not go back to this facility with his particular medical condition.

225. Apparently in response to this crisis and advocacy by AVRMC, DOC classification staff finally entered a "no private prisons restriction" on March 26, 2015, much too late to save his foot or any natural ambulation or ability to walk on his left foot.

226. Thus Mr. Choquette was transferred to the CTCF infirmary on March 28 with a "Diabetic L foot infection," where he would remain in a medical isolation unit for several weeks because of his systemic MRSA infection.

227. Among other recommendations to CTCF medical personnel, AVRMC physicians ordered that Mr. Choquette be provided with "a CAM walker/boot for [his] left lower extremity."

**Mr. Choquette at CTCF from late March to present**

228. Mr. Choquette remains at CTCF as of this filing, and during the 15 months from

late March, 2015 into July, 2016, CTCF medical personnel have as part of the continuing course of medically care derelictly continued to treat Mr. Choquette's known and serious medical condition in a deliberately indifferent manner.

229. Mr. Choquette was largely off-loaded, finally, once at CTCF.

230. This, again, occurred much too late to save his left foot.

231. On April 1, 2015 near the beginning of Mr. Choquette's current incarceration at CTCF, Dr. Timothy Creany reviewed Mr. Choquette's medical history and noted that his "L charcot foot is quite complicated and we will need ortho to follow this to guide us as to mgt. hoping that this will stabilize w a cam boot but if not may need surgery in the future."

232. Dr. Creany further noted that he would "ask [Denver Health] ortho to see [Mr. Choquette]- they have seen him before and can manage this difficult issue."

233. Dr. Creany also put in an order for the "CAM walker/boot" for Mr. Choquette's left foot, which had been recommended by AVRMC caregivers after Mr. Choquette's March 25 visit.

234. However, despite AVRMC physicians' orders to the contrary, CTCF medical personnel forced Mr. Choquette to ambulate with a walker in order to get his food.

235. In fact, on information and belief, CTCF medical personnel, with deliberate indifference and dereliction under these facts, told CTCF security personnel that it was good for Mr. Choquette to ambulate, as this would "help with the healing process."

236. On April 15, Dr. Creany ordered CTCF to expedite Mr. Choquette's consultation with Denver Health orthopedic specialists, writing: "plz notify scheduling that pt NEEDS to go to DH ortho. He has a rare condition that will require him to be seen by ortho in a large center,

not a local office." (Caps in original.)

237. By April 22 Mr. Choquette's MRSA infection had resolved and thus he was put on discharge status, to be re-housed within the CTCF facility but outside the infirmary.

238. However, this same day a "medical hold" was placed on Mr. Choquette which allowed him to stay in the infirmary until his CAM walker/boot arrived.

239. By May 9, 2015, Mr. Choquette's CAM walker/boot still had not arrived.

240. Nevertheless, HSA B. Hoffman personally intervened on May 9 and ordered Mr. Choquette's medical hold removed, stating to Nurse Jodi Sinker that the "boot being made…can be sent to wherever offender transfers."

241. On June 1, Mr. Choquette's CAM walker/boot still had not arrived.

242. Nurse Shandra Matlock inquired about the delay and found that the boot had not even been authorized until May 19. She noted "spoke to Jen Miscovitz with CHP who said boot and diabetic shoes were authorized 5/19/15."

243. Mr. Choquette was authorized temporary use of a wheelchair on June 3, while still waiting for his CAM walker/boot ordered months earlier.

244. In fact, Mr. Choquette would not receive the CAM walker/boot until July 6.

245. Between March and June of 2015, Mr. Choquette continued to have to weight bear and increase damage to his left foot due to the combined deliberate indifference of CTCF and CHP staff.

246. By the time he got his CAM protective device, it was far too late to allow any weight bearing on his left foot.

247. On July 21, 2015, a full year after DRDC medical personnel first diagnosed Mr.

Choquette with Charcot foot syndrome in his left leg, Mr. Choquette was finally allowed to visit Denver Health Medical Center (Denver Health) for a consultation with Dr. Chrystal Berg, DPM a podiatric specialist.

248. Dr. Berg described Mr. Choquette's left foot as "warm, swollen…[with] significant edema."

249. Dr. Berg further noted Mr. Choquette's "complete extension loss of protective sensation."

250. Dr. Berg described Mr. Choquette as "hav[ing] a very severe deformity," and his quality of life—due to his Charcot-affected left leg—as "poor."

251. Dr. Berg took particular note of the deliberately indifferent care and treatment of Mr. Choquette's condition by BCCF and CTCF medical personnel, writing: "[Mr. Choquette] apparently was diagnosed with edema and started on Lasix **and was not immobilized for the Charcot until over the last 2 weeks.**" (Emphasis added).

252. A Denver Health x/ray exam of Mr. Choquette's feet found "severe midfoot Charcot changes with fragmentation of the metatarsals. The navicular is subluxed medially. Overlying soft tissue swelling is present."

253. Referring to the x/ray exam, Dr. Berg stated: "Radiographs indicate severe Charcot changes throughout the mid foot with complete dislocation of the mid foot and **no well defined bones throughout the mid foot**."

254. Dr. Berg discussed treatment options with Mr. Choquette, including surgical, nonsurgical, reconstruction, and amputation, noting the "likely poor outcome of any surgical treatment" and thus that Mr. Choquette's stated preference for a left lower leg amputation was

not unreasonable.

255. Dr. Berg, a podiatrist, recognized the need for further specialist care, and recommended that Mr. Choquette receive a CROW walker for his right foot as well as a "follow up [with] ortho to discuss [amputation]."

256. Dr. Berg told Mr. Choquette that he could not bear any weight, at all, on his left foot regardless of whether he had a protective device. She explained that he would need surgical intervention for the left and that, once he had that, he could begin to rehab and try to ambulate on his right foot with a CROW walker.

257. A Charcot Restraint Orthotic Walker (or CROW walker) is a clamshell-design stable boot designed to accommodate and support a foot with Charcot neuropathy, commonly prescribed for patients with "chronic" stage Charcot patients who have lost protective sensation in their feet.

258. The CROW walker completely immobilizes the foot and ankle, and provides even support to the entire foot, thus protecting Charcot patients from developing the foot ulcerations which often result from Charcot foot deformities.

259. In making these recommendations Dr. Berg explained to Mr. Choquette that if he ever wanted to walk again he would need to have reconstructive surgery or most likely amputation for his left lower leg amputated and a prosthesis fitted.

260. Dr. Berg ordered follow up consultation with orthopedic surgery to determine which surgery he would have, but agreed that amputation was likely the reasonable choice.

261. Amputation and a prosthesis, in combination with a right-foot CROW boot to protect his Charcot-affected right leg, would allow Mr. Choquette to recover his ability to

ambulate.

262. If he tries to weight bear on his left, his ankle completely gives out because of the extreme damage done to the area including many broken bones.

263. Despite the clear findings of DPM Berg that Mr. Choquette's left foot was effectively destroyed as an ambulatory tool, and that he needed a follow-up consult with the Denver Health orthopedic specialist to further consider amputation or other surgical intervention, CTCF medical personnel with continuing deliberate indifference, about which Plaintiff has complained to absolutely no avail, have refused to allow Mr. Choquette to have his Dr. Berg-recommended follow-up orthopedic specialist consult.

264. Mr. Choquette has been begging since this meeting with Dr. Berg to be granted this orthopedic surgical consult and amputation. This has been denied by CHP as "not medically necessary" despite the unavailability of any reasonable or adequate medical alternatives. CHP claims that Mr. Choquette's specialist wants to try other 'modalities' prior to surgery, which is false in fact.

265. In so refusing CTCF medical personnel have ignored their own Dr. Creany's insistence that Mr. Choquette receive follow-up care and treatment at Denver Health from an orthopedic specialist.

266. As of the date of this filing, it has now been almost one full year since Dr. Berg recommended this follow-up consult with an orthopedic specialist, and more than a year since CTCF's own Dr. Creany recommended the same.

267. On August 6, 2015 CDOC formally denied Mr. Choquette the Dr. Berg-recommended follow-up orthopedic specialist visit, citing the following comment by "JAM" as

justification: "Denied, as no current signs of infection and they are recommending other modalities first. JAM"

268. On information and belief, "JAM" is the electronic signature of Dr. Jennifer Mix, Chief Medical Officer for Defendant CHP.

269. Jeff Archambeau, the CEO of Correctional Health Partners, works with jails to curtail spending on inmate medical needs. He has been quoted as saying that "a weekend in the hospital is a vacation from prison for some inmates" in relation to the problem of faking in jails and touting the database CHP uses to look for faking or malingering by an inmate to game the system.

270. Mr. Choquette is a victim to this over zealous monitoring of potential faking. His serious medical needs are being ignored pursuant to this custom of rejecting the medical complaints of inmates as an attempt to get out of jail.

271. CHP in this matter is treating Mr. Choquette's known serious medical needs as faked or exaggerated to get a "vacation" causing him permanent, and unnecessary irreparable injuries to save money. Privileging cost saving over constitutional care violates the 8th Amendment.

272. In basing her denial of Mr. Choquette's follow-up orthopedic visit on the bogus indifferent rationale, "they are recommending other modalities first," Defendant Mix consciously mischaracterized Dr. Berg's recommendations, which were to immediately outfit Mr. Choquette with a right-footed CROW boot *and* to facilitate his follow-up visit with a Denver Health orthopedic specialist.

273. Meanwhile, CTCF medical personnel conducted no further examination of Mr.

Choquette's Charcot-affected feet in August or September.

274. On October 29, 2015 Mr. Choquette went to the CTCF infirmary for a follow-up on his Charcot foot syndrome, where he explained to CTCF Dr. Gina Nelson that his July, 2015 visit with specialists at Denver Health produced recommendations for a CROW boot for his right foot and a consultation for possible amputation of his left foot.

275. Mr. Choquette also complained that his borrowed wheelchair was not working and could not support his weight.

276. During the month of November, 2015 CTCF medical personnel conducted no further examination of Mr. Choquette's Charcot-affected feet.

277. On December 9, 2015 Mr. Choquette's Charcot-related symptoms were again reviewed by NP Jane Gilden, who noted the severity of Mr. Choquette's neuropathy and loss of sensation, as well as the severity of his left-foot deformity: "extrem no sensation to monofilament from 5 inches above ankle to foot…Left foot grossly deformed with Charcot. Right with less deformity. No sensation in either foot."

278. NP Gilden further cruelly explained that she had discussed his situation with Defendant Mix last month "and as [amputation] would, at this point, be an elective procedure a consult would not be approved for ortho."

279. NP Gilden further wrote that she "would submit consult…for crow boot," noting in passing that the recommendation for this protective device had been made by Denver Health specialists some five months previously in July, 2015.

280. On December 17, 2015 Mr. Choquette was fitted for a right-foot CROW boot.

281. Mr. Choquette would not actually receive his CROW boot until February 16,

2016, nearly seven months after Dr. Berg recommended its immediate implementation at the afore-alleged July 21, 2015 Denver Health specialist visit.

282. Also on December 17, further x/rays of Mr. Choquette's feet showed "severe arthrosis in both feet."

283. However, presumably because CTCF's derelict current goal was only to "maintain stability and keep [Mr. Choquette's] feet free of ulceration and infection," no further action was taken on Mr. Choquette's request for the necessary follow-up appointment with Denver Health orthopedic specialists.

284. Mr. Choquette again requested on January 7, 2016 that he be allowed to follow-up with a Denver Health orthopedic specialist, only this time to be told by NP Gilden that Dr. Susan Tiona, the Chief Medical Officer for the Colorado Department of Corrections, had decided that amputation was an "elective procedure," and that because there was "no major change" between Mr. Choquette's June 4, 2015 and December 17, 2015 x-rays he would not be allowed this visit.

285. This is absurd as the ordered follow up was based on the terrible condition in July 2015. That his condition has remained terrible does not obviate the need for the ordered surgical follow up.

286. NP Gilden went on to state, nonsensically, given that Mr. Choquette's left-foot Charcot-related foot destruction and deformity was considerably more severe than that of his right foot, that "we would wait until he has [the] Crow boot for the right foot and then determine need for left foot."

287. Showing the conscious awareness of the severity and need for speed associated with Mr. Choquette's ever worsening condition, Nurse Gilden also cited a scholarly article she

reviewed, seemingly provided to her by Dr. Tiona, CMO, entitled "Conservative and surgical treatment of the chronic Charcot foot and ankle," and authored in 2013 by Dr. Mehmet Guven et al. in the peer-reviewed journal Diabetic Foot and Ankle.

288. Dr. Guven and colleagues offer a review of Charcot neuroarthropathy (CN), which declares on the very first page the critical importance of prompt diagnosis and treatment of Charcot: "**The consequences of the delay in diagnosis are severe and debilitating** such as structural deformity of the foot. This subsequent deformity in the presence of peripheral neuropathy greatly increases the risk of skin ulceration and lower limb amputation. **CN is a medical emergency, because if it is diagnosed earlier, the treatment can prevent the destructive process**." (emphasis added).

289. If only any of DRDC, BCCF, and CTCF's medical personnel would have treated Mr. Choquette's of left-leg Charcot as the "medical emergency" it obviously is as was known to all of them as they classified him otherwise, then Mr. Choquette would not be asking for a necessary orthopedic consult and now seeking amputation of his lower left leg

290. Notwithstanding the well known requirement recited in Dr. Guven's article, that Charcot requires quick action, Nurse Gilden, with deliberate indifference, noted only that "[Mr. Choquette] **might** be a candidate for evaluation by ortho." (emphasis added).

291. CTCF medical personnel reviewed Mr. Choquette's left-leg Charcot on February 9, checked his weight, but took no further action.

292. CTCF medical personnel again reviewed Mr. Choquette's left-leg Charcot on March 8, where CTCF Nurse Bree Nott noted a 5mm x 6mm sore on his outer left foot.

293. CTCF medical personnel took no further action.

294. Mr. Choquette came back in to the CTCF clinic for several days later in March for treatment of a larger skin ulceration on his left foot, precisely the sort that Dr. Guven and colleagues warned of.

295. On April 12 CTCF Nurse Christy Olsen examined Mr. Choquette's left foot, noting: "Lt foot swollen d/t Charcot's…pedal pulse decreased on Lt and 2+ on Rt…Lt lateral side discolored d/t deformation of joint."

296. Apart from scheduling a follow-up appointment two months later, CTCF medical personnel took no further action

297. Today, as of this filing, Mr. Choquette still has not been granted his follow-up visit with Denver Health orthopedic specialists, as recommended by Dr. Berg nearly one year ago on July 21, 2015.

298. Today Mr. Choquette has a destroyed left foot and lost ambulation.

299. Both bones in his left ankle are broken, as are all of the structural bones in his left foot.

300. Mr. Choquette's left foot is markedly deformed, and collapses onto itself the moment he tries to bear any weight on it.

301. Thus Mr. Choquette is entirely dependent on his wheelchair to get around.

302. As Dr. Berg has explained to Mr. Choqutte, his Charcot-affected left foot "is no longer viable as a foot."

303. The full extent of Mr. Choquette's injury, however, is not yet fully ascertained because CDOC/CHP/CTCF medical personnel, including Dr. Mix, and NP Gilden, with deliberate indifference in this continuing neglectful course of care will not allow, or even seek

reconsideration of the denial to allow, Mr. Choquette to have a follow-up visit with an orthopedic specialist.

304. Mr. Choquette has clearly suffered significant physical, economic, and emotional damages as a result of the deliberately indifferent and negligent medical care he received while at BCCF and CTCF.

305. Mr. Choquette now requires the amputation of his left leg below the knee, as well as the fitting of a prosthesis and significant physical therapy, in order to walk again.

306. Mr. Choquette also suffers severe emotional distress from having his Charcot foot syndrome preventably aggravated from deliberate indifference to the point where he requires amputation surgery. Mr. Choquette has long managed his diabetes and diabetes-related complications, and has thus spent a great deal of time and effort to prevent aggravation of his Charcot. The emotional trauma of watching his body deteriorate while medical professionals did nothing to save his foot haunts Mr. Choquette.

307. Mr. Choquette's efforts to manage his diabetes-related complications in his left ankle and foot were successful until his incarceration. Defendant CCA medical personnel had no legitimate reason to deny Mr. Choquette the use of protective devices that would have helped him to offload and immobilize his left ankle and foot, so as to avoid aggravating his condition and destroying his left foot as an ambulatory tool.

308. CTCF and CHP medical personnel have no legitimate reason to deny Mr. Choquette necessary follow-up specialist care or to condition such care on arbitrary weight-loss goals.

309. Mr. Choquette has an Eight Amendment right not to be denied based on cost

saving the medical care he obviously needs to allow him to ambulate and otherwise recover physically from what these Defendants have done to him.

310. As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiff has been substantially injured. These injuries include, but are not limited to, loss of constitutional rights, physical injuries, impairments, limitations and disfigurement, severe pain and emotional distress, anxiety, shock, sadness, depression, anger, pain, stress and/or aggravation of pre-existing conditions, economic loss and special damages for medically related treatment caused by the unconstitutional, negligent (with respect to private defendants), reckless and atrocious conduct of these Defendants.

311. His economic damages claimed in all claims for relief include the past and future costs of his care and treatment including a reasonable life care plan to address his resultant disabilities, to meet his permanent special needs, to address his psychological trauma flowing from these personal injuries, to fairly value to costs associated with his needs for specialized therapies and equipment related to these injuries as well as the costs of his future medical care related to these events including amputation and follow up care, prosthetic devices, ongoing therapy and treatment, household assistance, household accommodations, and the like all to be determined in an economic loss and rehabilitation/life care plan assessment to be provided at the time of expert disclosures and presented at trial.

312. Plaintiff has exhausted all applicable and available grievance procedures for this ongoing deliberately indifferent course of medical care spanning multiple jail facilities, both private and DOC.

313. No exhaustion is required under applicable regulations and procedures for

medical injury complaints resulting from improper classification.

314. Plaintiff further contends that the medical grievance procedures of DOC are unavailable as a simple dead end, with the responsible officers unable or consistently unwilling to provide any relief or meaningful redress.

315. DOC Medical grievances almost invariably end in a decision that the grievance officer is not a medical profession and cannot "second guess" the medical care provided.

316. All Defendants hereto are jointly and severally liable for this continuous debacle of deliberately indifferent care.

317. Plaintiff hereby gives notice that he anticipates seeking leave to amend his complaint to add punitive damages on his state law claims upon the completion of substantial discovery.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violation of 42 U.S.C. § 1983 – Eighth Amendment

(Against Individual Defendants Melgoza, Scarff, Gradin, Voris, Fish, Blumer, Creany, Meyer, Parkhill, Davies, Achen, Rodriguez, Gardunio, Contreras, Shockley, Fayre, Mix, Gilden and also against Rick Raemisch for purposes of injunctive relief only)

318. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

319. 42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

320. Plaintiff in this action is a citizen of the United States and all Defendants to this

claim are persons for purposes of 42 U.S.C. § 1983.

321. Plaintiff had a clearly established right under the Eighth Amendment to be free from deliberate indifference to his known serious medical needs and to proper medical care while in custody.

322. All Defendants to this claim, at all times relevant hereto, were acting under the color of state law.

323. DRDC individual Defendants were deliberately indifferent to Mr. Choquette's serious medical needs as described in the statement of facts.

324. These individual Defendants actually knew of Mr. Choquette's diagnosis of Charcot in both feet and his desperate and immediate need for offloading and protective devices and yet not only made no orders to that effect, but did not even tell Mr. Choquette of his diagnosis or place it in his record in such a way as to alert subsequent placements to his need.

325. These individual Defendants further actively participated in preventing Mr. Choquette from having the disability accommodations that he needed, including participation in his placement in a private jail that was not equipped to handle his medical needs.

326. DOC Individual Classification Defendants were deliberately indifferent to the serious medical needs as described in the Statement of Facts. These Defendants deliberately indifferently placed and knowingly maintained Mr. Choquette in a private jail that was not equipped to handle his medical needs, and was not approved for his mobility disability.

327. BCCF Individual Defendants were deliberately indifferent to Mr. Choquette's serious medical needs as described in the Statement of Facts. These individuals persisted in consciously ignoring Mr. Choquette's serious medical needs despite his ever mounting medical

crisis and refusing him known to be needed medical interventions to prevent his incapacity.

328. These BCCF Defendants were also deliberately indifferent in maintaining Mr. Choquette in their facility despite actively knowing that they could not provide constitutionally adequate care or needed accommodations.

329. Dr. Mix was and is deliberately indifferent to Mr. Choquette's serious medical needs as described in the Statement of Facts. Her conscious refusal to authorize needed interventions for Mr. Choquette, including further consultation with experts, surgery for his badly damaged right foot and rehab so that he can return to ambulation post surgery is deliberately indifferent.

330. Jane Gilden was and is deliberately indifferent to Mr. Choquette's serious medical needs as described in the Statement of Facts. Her conscious refusal to obtain authorization for Mr. Choquette's badly needed medical care including surgical consult and follow up is deliberately indifferent.

331. All individual Defendants named herein actually knew of Mr. Choquette's left-leg Charcot foot syndrome diagnosis, his right-leg Charcot diagnosis, and his chronic diabetes, and nonetheless failed to treat his Charcot or offer him the use of protective devices which would offload or immobilize his left ankle and foot or to cause him to be placed in an appropriate facility. Individual Defendants did so despite being expressly aware of Plaintiff's known and serious medical needs and recklessly disregarding a substantial risk of physical harm to Plaintiff.

332. Individual Defendants continued to act in bad faith and with deliberate indifference to Plaintiff's serious medical needs and constitutional rights when they willfully ignored his repeated requests for medical attention and intentionally denied and/or delayed his

access to medical care.

333. On information and belief, individual Defendants' actions were undertaken in bad faith and indicate a willful and wanton disregard and deliberate indifference to Plaintiff's civil rights.

334. Each of the individual Defendants is individually liable to the Plaintiff for violation of 42 U.S.C. § 1983.

335. The acts or omissions of all individual Defendants were conducted within the scope of their official duties or employment.

336. The acts or omissions of all individual Defendants were proximate causes of Plaintiff's injuries.

337. The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of his constitutional rights and caused him other damages.

338. As a direct result of Defendants' unlawful conduct, Plaintiff has suffered injuries, damages and losses as described herein entitling him to compensatory and special damages including attorneys' fees in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, Plaintiff has incurred significant special damages, including past and future economic losses as described. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

339. In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against each of the individual Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of

Plaintiff.

340. Medical and administrative personnel at CTCF, acting under color of state law, continue to violate Mr. Choquette's Eighth Amendment rights now, and will continue to do so if this Court does not grant relief.

341. The Court is asked to Order against Rick Raemisch in his official capacity such appropriate declaratory, preliminary and or permanent injunctive relief as it deems necessary upon suitable motion.

**SECOND CLAIM FOR RELIEF:**
**Violation of 42 U.S.C. § 1983 – Eight Amendment**
(Against entity Defendants CCA and CHP)

342. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

343. 42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

344. Plaintiff in this action is a citizen of the United States and the Defendant to this claim is a person for purposes of 42 U.S.C. § 1983.

345. Plaintiff had a clearly established right under the Eighth Amendment to be free from deliberate indifference to his known serious medical needs and to proper medical care while in custody.

346. Defendants are sued herein for their deliberately indifferent and reckless policies,

practices, habits, customs and widespread usages with respect to the serious medical needs of inmates like this Plaintiff, who have chronic conditions such as Charcot foot syndrome, and for their deliberately indifferent failures in training and supervising their individual Defendant employees.

347. Defendants have at all times relevant hereto acted under the color of state law.

348. Each Defendant hereto recklessly denied seriously needed medical care causing severe injury as part of cost savings related policies and customs.

349. CCA has a policy and practice of encouraging medical staff to ignore serious medical needs and treat inmate complaints as exaggerated or faked rather than provide even obviously needed medical care for serious medical needs. Defendants acted, or failed to act, in bad faith and with deliberate indifference to the obvious serious medical needs of patients and inmates, including patients like Mr. Choquette with known and serious chronic diabetes-related complications.

350. On information and belief, Defendants knew that potentially serious or fatal consequences could be suffered by such individuals (including Mr. Choquette) by their challenged policies and practices and by their failure to properly train and supervise medical care and/or develop adequate policies.

351. Defendants' policies, customs, and/or practices in failing to properly train and supervise their employees and/or agents were also moving forces and substantial significantly contributing proximate causes of the violation of Mr. Choquette's constitutional rights.

352. Defendant CCA's customs, practice and habits of accepting and maintaining inmates whose needs it knows it cannot meet is deliberately indifferent and was a moving force

in Plaintiff's injuries.

353. Defendant CCA's custom, practice, habit, policy and training and supervision of employees foster an environment of deliberate indifference to serious medical needs, treating inmates needs as faked or exaggerated and ignoring those needs even when it is known that the inmate is complaining of a serious medical need was a moving force in Plaintiff's injuries.

354. Defendant CCA, in acting with deliberate indifference in training, supervision and policy making, have a profit motive to maintain inmates at prisons that cannot provide constitutionally adequate care or sufficient accommodations, and to deny surgeries and other medical interventions that are badly needed rather than pay for them.

355. Defendant CHP is deliberately indifferent in training and supervision of employees and policy making in that it has a custom, habit and practice of refusing badly needed medical care for known serious medical conditions to save money even when it is known that such refusals will result in serious medical injuries. These policies, practices and customs were a moving force in the underlying deliberate indifference complained of herein with respect to refusing access to known necessarily medical follow up.

356. The acts or omissions of these Defendants, as described herein, deprived Mr. Choquette of his constitutional rights and caused him other damages.

357. As a direct result of Defendants' unlawful conduct, Plaintiff has suffered injuries, damages and losses as described herein entitling him to compensatory and special damages including economic losses as described above for the costs of past and future care related needs..

358. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

359. In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against the private corporate Defendant CCA under 42 U.S.C. § 1983, in that the policies, practices, actions and failures to act of Defendant CCA was undertaken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

360. Finally, Plaintiff seeks appropriate declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 to redress Defendant CHP's ongoing deliberate indifference in policies, training and supervision with respect to the serious medical needs of patients and inmates in violation of the Eighth Amendment of the Constitution.

**THIRD CLAIM FOR RELIEF:**
**Negligence**
(Plaintiff against Defendant CCA, Defendant CHP, Individual BCCF Defendants and Dr. Mix)

361. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

362. Defendant CCA is a private corporation that contracts to provide medical care and health services to inmates at Bent County Correctional Facility.

363. Defendant CCA, Defendant CHP, BCCF Individual Defendants, and Dr. Mix are not entitled to any state law governmental immunity.

364. At times relevant hereto, Plaintiff Choquette was under the care and treatment of the Defendants hereto through contractual relationship to provide medical care for inmates.

365. Defendant CCA is vicariously liable for the negligent acts and omissions of its agents and/or employees including those named individually herein, and directly liable for its own negligent failures in training, policies, and practices.

366. Defendant CCA and the BCCF Individual Defendants had a duty to provide reasonable medical care and treatment to inmates at Bent County Correctional Facility, including Mr. Choquette. Defendant CCA had a duty to exercise reasonable care in the training and supervision of its employees.

367. Also at times relevant hereto, Plaintiff Choquette is under the care of Defendant CHP's medical employees and Dr. Mix, who have a patient relationship with him through their contractual obligation to review and make decisions about the medical need for medical treatments. She owed him a duty of due care in reviewing his medical requests. She breached these duties causing injuries.

368. These Defendants have each breached their duties to grant access to reasonably needed care by denying Mr. Choquette access to care that is medically necessary to prevent loss of limb and ambulation.

369. These duties of care owed by all of the Defendants to this claim are informed by state law. Under C.R.S. §16-3-401, "prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation under this and other statutes. These duties are also informed by NCCHC standards.

370. Employees of the Defendant CCA, while acting within the scope of their employment, variously committed negligent acts and omissions as set forth herein with respect to the care and treatment of Plaintiff Choquette.

371. All Defendants hereto had caregiver-patient relationships with Plaintiff and were acting or failing to act within the scope of their employment with Defendant CCA and/or

Defendant CHP at all times pertinent to this Complaint.

372. Involved caregivers at the jail owed Mr. Choquette a duty to exercise that degree of care, skill, caution, diligence and foresight exercised by and expected of nurses, nurse practitioners, and other care givers in similar situations.

373. Involved caregivers at BCCF grossly deviated from that standard of care and were negligent in failing to properly care for and treat Plaintiff Choquette's known and serious medical needs as described in the Statement of Facts.

374. CHP related Defendants breached their duty to allow Plaintiff access to badly needed medical care, placing cost over need.

375. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Choquette suffered and continues to suffer significant physical pain, emotional suffering, permanent disability, economic loss and other damages.

376. Plaintiff Choquette is therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages for economic losses, all in amounts to be proven at trial.

377. Although not required, Plaintiff hereby gives notice that he may be seeking to amend the complaint to add punitive damages against these Defendants on these state law claims because the injuries complained of are attended by circumstances of fraud, malice or willful and wanton conduct engaged in by their employees and agents.

## VI. PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and enter the following relief:

1. Award Plaintiff compensatory, non economic, consequential and economic damages as proven at trial against all of the Defendants;

2. Award Plaintiff special damages as proven at trial;

3. Award Plaintiff punitive damages relating to the federal claim brought in this matter against all Defendants except Rick Raemisch;

4. Award Plaintiff punitive damages relating to the state law claim should Plaintiff file suitable amendment of the complaint;

5. Award Plaintiff attorneys' fees and costs as provided for under all applicable federal and state statutes;

6. Award Plaintiff interest from the earliest possible date under appropriate federal and state statutes;

7. Grant plaintiff preliminary injunctive relief upon motion and/or permanent final injunctive relief to stop the constitutional violations described above and to end this medical crisis for Plaintiff;

8. Grant such other relief as may be appropriate at law and equity.

PLAINTIFF RESPECTFULLY REQUESTS A JURY TRIAL ON ALL TRIABLE ISSUES.

*/s/ Anna Holland Edwards*
Anna Holland Edwards
John Holland
Dan Weiss
Erica Grossman
HOLLAND, HOLLAND EDWARDS & GROSSMAN, PC
1437 High Street
Denver, CO 80218

**CERTIFICATE OF REVIEW**

This is to certify that undersigned counsel has conferred, pursuant to Colorado statutes, with a person who has extensive expertise in the areas of alleged negligence and deliberate indifference to serious medical needs and that this professional has reviewed the known facts, including such records, documents, and other materials as he has found to be relevant to the complaint allegations of negligent acts and omissions, and has concluded that the filing of these claims do not lack substantial justification and in fact are substantially meritorious and involve clear violations of the standards of care involved.

*/s/ Anna Holland Edwards*
Anna Holland Edwards